UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

In re: Joseph Anthony Mazziotti

    Debtor                                CASE NO. 03-36114

                                              CHAPTER    7

Pure H2O Bio Technologies, Inc.

    Plaintiff

vs.

Joseph Anthony Mazziotti,
Louis J. Mazziotti, and
Gus Goldsmith

    Defendants                          Adv. Proc. No. 03-3178

**MEMORANDUM-OPINION**

THIS CORE PROCEEDING[1] is before the Court after the conclusion of a trial on the merits of Plaintiff's Renewed Motion of Contempt (the "Contempt Motion") and Counts III through IX of Plaintiff's Second Amended Complaint for Determination of Nondischargeability of Debts, Avoidance of Post Petition Transfers and Subordination of Lien (the "Complaint") brought against Defendants Joseph A. Mazziotti ("Mr. Mazziotti") and Gus Goldsmith ("Mr. Goldsmith) (Mr.

---

[1] 28 U.S.C. §§157(b)(2)(A),(H) and (K).

1

Mazziotti and Mr. Goldsmith collectively referred to herein as "Defendants").[2] For the reasons set forth below, the Court denies the Contempt Motion and finds in favor of Defendants on Counts III through IX of the Complaint. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052.

## FINDINGS OF FACT

On July 17, 2006, this Court entered an Order (the "Original Order"), which had been agreed to by the parties, permitting Mr. Mazziotti to refinance the loan on his residence in accordance with a letter of commitment attached to the Original Order. The Original Order also provided for the subordination to such new financing of the lien against Mr. Mazziotti's residence held by Plaintiff "to the extent that only prior and superior liens[,] perfected against the real property in question prior to the date of filing of Pure H2O's lien shall be paid." The Original Order also expressly prohibited Mr. Mazziotti from receiving cash from the new financing and required that he file with the Court the settlement statement from the closing in advance of the closing.

On October 17, 2006, in addressing Plaintiff's motion to vacate the Original Order on grounds that Mr. Mazziotti had failed to close the loan contemplated by the Original Order, this Court entered an Order (the "Substitute Financing Order") denying Plaintiff's motion without prejudice to reasserting it if Mr. Mazziotti did not obtain and close substitute financing on or before October 26, 2006. Plaintiff did not reassert its motion, despite the fact that Mr. Mazziotti did not obtain substitute financing by the October 26, 2006 deadline.

Instead, Plaintiff's attorney at the time, Charles M. Friedman ("Mr. Friedman") apparently took the position that the closing of Mr. Mazziotti's Chapter 7 bankruptcy case on May 20, 2004, had deprived this Court of jurisdiction over Mr. Mazziotti's residence, making the Original Order inapplicable. Mr. Goldsmith's witness, attorney Murray Greenwald ("Mr. Greenwald"), testified credibly and without contradiction by Plaintiff that he had spoken with Mr. Friedman about the need to obtain an Order from this Court removing certain conditions from the Original Order and that Mr.

---

[2] A separate trial on the merits shall be held on Counts I and II of the Complaint. Although at one time named as a Defendant in this Adversary Proceeding, Defendant Debra J. Mazziotti has been dismissed as a party to this Adversary Proceeding. Also, Defendant Louis J. Mazziotti is not named as a party to the Contempt Motion or Counts III through IX of the Complaint.

2

Friedman asserted to Mr. Greenwald that the Original Order was unenforceable and offered to sign a subordination agreement on behalf of the Plaintiff. Mr. Friedman in fact signed a subordination agreement on behalf of Plaintiff on October 30, 2006 (the "Subordination Agreement"), and the loan that triggered the instant dispute closed on December 8, 2006 (the "Refinancing").[3]

Mr. Friedman testified that he signed the Subordination Agreement only for use at a loan closing intended to be held two weeks later, which did not take place, and that he left blank the amount of the loan to which Plaintiff's lien would be subordinated with the understanding that the same would be filled in only with his approval. He further testified that he did not approve the amount ultimately inserted in the Subordination Agreement.

In stark contrast, Mr. Greenwald testified, credibly and without subsequent contradiction, that the parties understood that the blank in the Subordination Agreement would be filled in once the exact loan figure was determined, based upon negotiations between Mr. Goldsmith and Mr. Mazziotti over what prior loans and liens needed to be paid off. In that regard, Mr. Greenwald further testified that Mr. Friedman actively engaged in discussions about a lien against Mr. Mazziotti's residence held by another of Mr. Friedman's clients, McKenzie & Peden. Indeed, on December 7, 2006, Mr. Friedman sent Mr. Greenwald's office a fax stating as follows: "The payoff figure, as of tomorrow, December 8, 2006, is $12,197.83. Let me know when a check is available and I will come pick it up." Mr. Friedman picked up the check for his client, McKenzie & Peden, on December 11, 2006. Mr. Greenwald testified, credibly, that he provided Mr. Friedman with a copy of the Refinancing closing settlement statement at that time.[4]

Given the credibility of Mr. Greenwald's testimony and the fact that Mr. Friedman clearly participated at some level in the closing of the Refinancing, which occurred *after* the aborted loan

---

[3]Mr. Mazziotti borrowed a total of $799,000.00 from Mr. Goldsmith. The loan proceeds were used to obtain the release of several liens against Mr. Mazziotti's residence that were superior to Plaintiff's lien. The loan proceeds were also used to pay off certain of Mr. Mazziotti's debts, including a car loan from Mr. Goldsmith, that did not represent encumbrances superior to Plaintiff's lien. Mr. Mazziotti also received $48,231.47 cash proceeds from the loan, which he agreed to use to make the first six monthly payments on the Refinancing loan.

[4]He also believes that his office would have faxed a copy of that settlement statement to Mr. Friedman prior to the closing.

3

closing to which Mr. Friedman purportedly limited use of the Subordination Agreement, the Court must discount Mr. Friedman's version of the events. The Court finds that the Subordination Agreement was not used without Mr. Friedman's authorization. Furthermore, Mr. Friedman indisputably acted as Plaintiff's agent at the time that he signed the Subordination Agreement on behalf of Plaintiff.

On February 13, 2007, Mr. Friedman filed on behalf of Plaintiff a "Motion Pursuant to 11 USC §549 of the U.S. Bankruptcy Code to Compel Joseph Mazziotti, Debra Mazziotti, and Others to Disgorge Funds Obtained at Closing on December 8, 2006, and Find All Offending Parties in Criminal Contempt for Their Violations of This Court's Order Dated July 17, 2006, and Further Adjust the Priority of the Lien of Gus Goldsmith Regarding 1019 Anchorage Woods Circle, Louisville, Kentucky 40223, to Place the Parties in the Position Intended by Order of Court" (the "Initial Contempt Motion"). On March 15, 2007, Mr. Mazziotti filed a response to the Initial Contempt Motion and a separate motion seeking modification of the Original Order, essentially to approve the Refinancing. On June 13, 2007, Mr. Friedman filed a motion to withdraw as attorney of record for Plaintiff.[5] On August 22, 2007, Plaintiff's new counsel filed the Contempt Motion, which in essence replaced the Initial Contempt Motion, and filed a motion to amend Plaintiff's Complaint to assert various claims arising out of the Refinancing–Counts III through IX–against Mr. Mazziotti and other defendants. The Court granted Plaintiff's motion to amend and set an evidentiary hearing on the Contempt Motion and Counts III through IX of the Complaint for February 13, 2008.

## CONCLUSIONS OF LAW

Plaintiff seeks equitable relief and bankruptcy courts are courts of equity.[6] *See Securities*

---

[5]That motion was granted on February 14, 2008.

[6]Although in Counts III through VII of the Complaint Plaintiff seeks relief under 11 U.S.C. §§549 and 550, which might conceivably be characterized as providing other than equitable relief, the Court notes that those provisions of the Bankruptcy Code are normally the province of the bankruptcy trustee. Although creditors under certain circumstances might formally seek and obtain the right to pursue claims under 11 U.S.C. §§549 and 550, Plaintiff clearly has not done so in this case. Thus, even if the Court did not find Plaintiff incapable of pursuing its claims because of "unclean hands," the Court would find that Plaintiff lacks standing in this case to bring the claims represented by Counts III through VII of the Complaint.

4

*and Exchange Com'n v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 455 (1940).  Accordingly, Plaintiff must come to this Court with "clean hands."  *See Precision Instrument Mfg. Co., et al. v. Automotive Maintenance Machinery*, 324 U.S. 806, 814 (1945) ("'[H]e who comes into equity must come with clean hands.'").  As explained by the U.S. Supreme Court in *Precision Instrument*:

> This maxim is far more than a mere banality.  It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.....It is 'not bound by formula or restrained by any limitation that tend to trammel the free and just exercise of discretion.'...Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character.  Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

*Id.* at 814-15 (internal citations omitted).

Here, Plaintiff's execution of the Subordination Agreement deprives it of the clean hands necessary for it to demand equitable relief from this Court with respect to the Refinancing.  The Refinancing clearly would not have taken place but for Plaintiff's signing of the Subordination Agreement.  Plaintiff therefore cannot now be heard to complain about the Refinancing or seek to obtain a better financial position through equitable subordination of Mr. Goldsmith's loan.  For this reason alone, the Court must deny the Contempt Motion and find against Plaintiff and in favor of Defendants with regard to Counts III through IX of the Complaint.

A separate Order consistent with the foregoing has been entered in accordance with Federal Rule of Bankruptcy Procedure 9021.